Will the argument next in Scottsdale Insurance Company v. McGrath, 21-2641 and 21-2643. Mr. Counsel, have you determined the order of argument with respect to the cross-appeal? We have not discussed that. I believe he's going to request two minutes to follow up.  Good morning, Your Honor. My name is Alexis David Gaskill. I represent the plaintiff, Acoma Cross-Appeal, Scottsdale Insurance Company. I first want to address Gaskill and Peel. I have a few remarks about the cross-appeal at the end of my presentation. I appreciate your glasses. Thank you, Your Honor. I appreciate it very much. Your Honor, I was going to ask you if you wanted me to do that. Could you get a little closer to the microphone? I'm having a little trouble hearing. Thank you very much. But you didn't go ahead and ask him in this case, for one. But wasn't this a particular — I mean, you both are contesting whether Mr. McGrath is an insured, and that is one of several different claims and counts that were brought. And that's a legal determination based on whether the company was a subsidiary and so on. But part of my concern about this stipulation is that you have agreed that if we reverse or vacate and remand in any part, for example, just as to whether Mr. McGrath was entitled to see consequential damages, the whole stipulation falls apart and the thing goes back to the district court. And there's been no determination, as far as I can tell, by the district court about whether there's actually coverage here. So, you know, this feels to me like we could be seeing piecemeal appeals, which is highly inefficient. And this, you know, conditional stipulated final judgment subject to reservation of rights on appeal that could be undone in numerous respects strikes me as not really representing a final judgment. I respectfully disagree, Your Honor. Let me explain. Please, please do. So, as the court noted, when the district court in the second order discussed this first decision, the court said we did not reach the final question whether there's a cover claim. Right. However, we had the third-party complaint that was filed by Hanford in that litigation. Scottsdale was defending the watershed and his officers in that action. We felt that if Mr. McGrath wasn't insured, the same logic would compel Scottsdale to cheat. The third-party complaint asks if McGrath has a cover claim. And because his defense expenses, and we reviewed invoices, et cetera, that were provided by Mr. McGrath's counsel, indicated that the remaining policy limit was exhausted, we agreed to stipulate to that issue so that if this court— To what issue, precisely? We agreed to—the intent behind the stipulation, Your Honor, is that if this court agrees Mr. McGrath was insured and affirms the first order, then Scottsdale disagreed that Hanford's lawsuit complaint is a cover claim and that his main policy limit should be met. Oh, sorry. If we affirm. If you affirm the first order. Correct, Your Honor. Okay. But if we affirm the first order, finding he's an insured, but then we reverse the dismissal on the bad faith refusal to defend or on the consequential damages, doesn't that, under the stipulation, send the whole thing back? Indeed. The case continues, and then there's a coverage decision, and there's a lot more to do in the district court. Isn't that right? No. I respectfully disagree, Your Honor. Please. My intent is that if the court affirms the first decision but reverses the second decision, it's our intent that the coverage issue has been resolved, that the remaining policy limit is obtained through Scottsdale, and the remand would be limited to whatever issue the court remands as to the second counsel of the court. But let me interrupt for just a second because the stipulation says that if either the first order or the second order is reversed, reversed in part, or vacated and remanded in whole or in part, then the stipulated conditional final judgment shall be void. Right? In paragraph 3? I see that language, Your Honor, but that's not what the party's intent? It's not. It's not, Your Honor. The party's intent is if the court affirms the first order, then the paragraph 4, excuse me, paragraph 4 is out. If we affirm, no matter whether we do something else with regard to the bad faith count? It's the party's intent, Your Honor, that if you affirm the first order and reverse the second order, the remand would be limited to counterclaim counsel. That isn't what you wrote. That's not what you wrote. I apologize, Your Honor. You're talking to us about intent, and yet that is not reflected in what you wrote. It should have said after shall be void, as to the order that's reversed or vacated, and not as to. In other words, if you affirm one and vacate the other, the first order should stand at that. Is it what you're really after is a consideration of whether he's an insured or not? And that was a question that was susceptible to a 54B certification, potentially, right? It was, and we evaluated that with our client. Again, Judge Lyman very recently denied a motion that almost had that in the past, and we had the remaining question of the count to. Of course, that doesn't create, I mean, that doesn't help us if we don't have jurisdiction, you know? We only have jurisdiction, obviously, over, you know, final judgments, appeals of final judgments, and this seems doubtful as to its finality. But anyway, I've taken up all your time, but it's obviously an important threshold question. I think, again, now that you've pointed out the order safety problem, there should have been further language at the end. Well, let me ask you about a solution. So there's obviously an appellate jurisdiction problem, potentially, but that would not prevent you from going back to Judge Lyman, it seems to me, with the correct language and maybe even notwithstanding that prior ruling to which you keep alluding, asking him for a Rule 54 certification. Well, Your Honor, there's another option we had discussed with Mr. McGrath's counsel, and we didn't see how practically, even when we received the report, it's older than in the space of the Rule 54. No, no, no. We can discuss that. My two favorite words are move forward. So moving forward, what do we do? Well, Your Honor, we would be, again, I think there's language we could add at the end of that paragraph 3 that makes it clear that only the order that's recursively vacated would be set aside. We could add that language and take the judgment back to the district court and ask the district court to enter it again, because I think the district court sort of read things the way that we did, because we had sent them a letter and discussed this proposal with them before we submitted it. Because, again, it's our intention that if we're not going to revisit the question of coverage, if you affirm the first order, we think that's resolved by the first order. So you think if we affirm the judge's decision that McGrath was insured, the duty to defend is established, notwithstanding the timeliness of the claim or the timing of the wrongful conduct? Well, the question of the timing of the wrongful conduct is resolved by the question of when he became insured. As to our fourth count, which raised the notice, we abandoned that when we entered this stipulated conditional judgment. You've abandoned the timeliness of the untimeliness or timeliness of the notice. Right. That's why in the paragraph 4 of the stipulation, it says that if you affirm, we agree to pay the game limit. It was not really transparent, I'm afraid. Okay. So we'll hear from – well, I know that you've got a little bit on the merits. I would like to address the merits. I'll give you a few minutes, and then we'd like to hear from the other side. Okay. So very simply, to be honest, I don't have a lot of time at this point. We believe that this report here in the first quarter by not focusing on subpart B of the definition of subsidiary, which expressly addressed the situation where you have a co-owned joint venture where management and control does not rest exclusively on watershed. Everybody recognized that Rocky Aspen did not satisfy that sub-theme part of the definition of subsidiary. Up until the watershed option treaty, everybody also recognized Rocky Aspen did satisfy that sub-theme part of the definition. After watershed exercised the options, that intervening period we were concerned with is our position, Ron, that as long as McGrath remained co-manager, that subpart B was not satisfied. And the issue for the treaty was not at that point. But we think the issue for AIR was in shifting his focus to subpart A because, in our view, the more specific provision that specifically addressed a jointly – a co-owned joint venture should have controlled the analysis. And the decision that that condition was not met should have been the end of the analysis. And we think, for that reason, the first quarter should be reversed. Now, I can keep going, obviously, but if you want to hear from a host of counsel at this point, I understand that, but I'll make one further point. Thank you. One of the canons of contract construction is to interpret agreement as a whole, given its purpose, the language of the agreement, and what the parties will try to accomplish. And we submit that the district court's decision in its first order led to an absurd result. Mr. McGrath never bargained for insurance coverage from Watershed. There's no provision in the operating agreement to address the insurance coverage for Latinasca. Mr. McGrath, while he was a co-manager of Latinasca – Are you suggesting that the director or officer of any subsidiary of a large company that owns a lot of different companies needs specifically to bargain for, to obtain coverage to be considered a covered under the standard DNO policy? I'm not suggesting that, Your Honor, but because this was a co-owned joint venture with two co-managers and it was not a company that was controlled by Watershed, it falls outside that standard construct that Your Honor just advanced. The only reason Mr. McGrath became entitled to insurance coverage in the district court's view is because he defaulted on his financial commitments to Watershed, resulting in the Watershed Option Tribunal. But if we disagree with you on the any entity as opposed to joint venture entity, then that's just the language that includes directors and officers of subsidiaries would cover. I mean, you've got another separate argument, I understand, with respect to this argument. But, again – It would cover him, notwithstanding the fact that he didn't separately negotiate the policy. Is that fair? Again, Your Honor, you have to – Is that fair? If the circumstances of subpart D, which specifically addresses this particular entity, were met, that is fair. He would not have to, if the circumstances of subpart D were met, specifically negotiate coverage. That's true in any typical, you know, DNO coverage situation. What makes this case unique is because Brock Gassman was specifically addressed in subpart D. Okay. And we understand the district court's reasoning comparing any entity language in subpart A. We understand what the court said. Yeah. But we believe he erred in not giving precedence to the specific language in the contract that addressed the situation. And, again, if you look at his second order, when he discusses this as a decision, and he's dealing with the advanced paper question, he says that our argument, that this led to a certain result, has some force, just not enough force to carry the case. Let's hear from your friend on the other side, and then we'll – Certainly, Your Honor. I'm sure, again, hear from you. Thank you, Your Honors. My name is Luke McGrath of Dumbarton Bar-Ford & Miller, and I represent Patrick McGrath in this appeal. But don't hold that against me. So I'd like to address the jurisdiction. Are you reserving how much time? I'm reserving two minutes, Your Honor. Two minutes, okay. The jurisdictional point – I'm in concurrence with Laps, with Mr. Orgetsky, but I did want to raise one point that I don't want lost on the panel, and that is if you affirm the – what we call the coverage decision, then – but remand it, we're then before the district court, and the panel's worried that the district court would have a lot to do. The standard is actually, does the district court have anything to do now that a final judgment has been rendered? Correct. Not what happens on the reading. So that is my question. Right. So – and here, this is where I think the rubber meets the road. Scott Salem has already provided insurance to Stephen Golia, Mr. Hamway, and other directors and officers of the watershed subsidiary Rocky Aspen. That is the same subsidiary that Patrick McGrath was manager of, a DNO officer of. So to echo what counsel has said, even if we're looking at what does the district court have to do when we go back, if there's a remand on the damages issues, Scott Salem can't then start to argue that the policy somehow excludes coverage of Rocky Aspen's directors and officers because of timing or because the notice was already too late, for example. It wasn't under the policy because what the policy says is you have to give notice 60 days – as soon as practicable, but 60 days at the very latest, 60 days after the end of the policy. The claim, the notice of claim, the date of the notice of claim was 11-9-2016. That's JA1065-68. That claim attaches the Hanford answer and complaint in the case 16CB04270, which is the Judge Marrero case. And in the first refusal letter, as we call it, which is JA1072, where Scottsdale responds, Scottsdale agrees that notice was timely, and he says in that document a few things that are relevant to both the jurisdictional analysis and then to the other merits. So let me just bear with you on this. It's a little bit of a walk. First, Scottsdale acknowledges receipt of the email correspondence that attaches the Hanford holdings complaint in Judge Marrero's case. So Scottsdale is saying we have that. That was attached to the notice, so your notice includes all the claims, all the allegations in that complaint. So right there, if we go back to Judge Wyden, Scottsdale cannot say that McGrath is different. Scottsdale already tendered a defense to these other DNOs. Now, Scottsdale can make other arguments that these were Watershed officials, but they were also these Scottsdale, these Rocky Aspen officials. Another thing about this original letter of refusal is it specifically mentions Patrick McGrath and says we're refusing coverage for Patrick McGrath. It also says it refuses coverage for RAM 204 LLC. It does not refuse coverage for Rocky Aspen. Now, here's where I'm going to lead a little bit into benefit, but I don't know how long I'm going to have you guys. So in the bottom of 1070, Scottsdale says that the Hanford complaint in front of Judge Marrero, it deals with the right to ownership of RAM 204 LLC. That's completely incorrect. The Hanford complaint and the Victor Marrero case deals with the ownership issues and securities fraud claims swirling around Rocky Aspen LLC. RAM 204 is the manager of Rocky Aspen LLC. So I'm going a little bit off jurisdiction into bad faith here, but one of the badges of bad faith is the lack of investigation and the mistake in the refusal letter. This refusal letter is just plain wrong. So then let's go back to what the refusal letter does, too. It also acknowledges that the entity at issue, even though they get it wrong, is also in a Chapter 11 reorganization proceeding with the U.S. Bankruptcy Court. So again, Scottsdale is acknowledging we have all the facts. We have the Hanford complaint. We know about the bankruptcy. We stepped in and got by with regards to RAM 204, and we thought RAM 204 was Rocky Aspen. But still, we'll go forward. And then they go through an analysis. They don't go through an analysis attached to a graph, again, a badge of bad faith. They go through no subsidiary clause analysis in this refusal, none. This goes from 1070 all the way to 1075, and there's no discussion about how Patrick McGrath is somehow not insured for any reason. But specifically, there's no discussion here about A versus B, joint venture versus no joint venture. And one of the things that this court must keep in mind, again, this is poor jurisdiction, but also leads into bad faith, the status of subsidiary for Rocky Aspen, not RAM 204, the real Rocky Aspen. That was determined March 24, 2015. That's when the watershed option triggering event happened. The timeline here is incredibly important. We list two or three different types of timelines in our briefing. The policy was entered into November 2016. So with all due respect to my adversary, if we get on with it. Oh, excuse me a second. I thought the policy was entered into November 2015 and ended November 2016. I'm sorry. That's correct. 2016. But my point is still correct. I got the five plus six. Yeah. The point is that at the time that Scottsdale negotiated the watershed for this policy, Rocky Aspen was already a subsidiary. So the idea of stranger to this contract, the idea that, oh, this was an accident that McGrath somehow hindered into coverage, that can't possibly be true. Because Rocky Aspen was already defined as a subsidiary in Section A, not Section B, when the policy was negotiated and the policy was entered into. Because by that time, AHTB, which was the co-member with RAM 204, the correct RAM 204, not the confused RAM 204, they were the original members of Rocky Aspen, and AHTB lost its voting rights March 25, 2015. And the reason why they lost their voting rights, because there were certain things that had to open with this restaurant. And the restaurant didn't open in time. And David Burke did not show up because the watershed kicked him out. And there's so many facts that a jury really has to look at this, because it's not a matter of law issue. But as for jurisdiction, I agree with my counsel, my co-counsel, not my co-counsel, my editor, that there really was nothing to do before we got to this level of the appeal. Once the initial judgment was entered, and yes, it would have been better if we had better language in there. But once it was entered, the only thing left for the courts to do was to prepare the docket for appeal. So I may not be following every jot and tittle. But so if – what is your view? If we affirm the district court's ruling that Mr. McGrath isn't insured, but we reverse on his dismissal of the bad faith ground, does the joint stipulation fall apart in your view, or is it still effective? If we go back to Judge Lyman and the factual underpinnings of that conditional judgment, vis-a-vis coverage issue, should self-provided coverage, that remains intact. And so that part of the conditional judgment would remain intact. I don't have to argue. He doesn't have to defend about whether or not we were entitled to the policy limit amounts. But it doesn't – doesn't that – You focus on, I take it, bad faith and the consequential damages and the punitive damages. Punitives. Yes, correct. That's it. And you don't have to cover all the ground. It would be so much more efficient. But again – but again – The judgment was final. The district court couldn't do anything after the judgment. But do you agree that the language does not in the stipulation doesn't so provide? It doesn't. It provides that if there's a vacatory remand as to Order 1 or Order 2, in any respect the stipulation shall be null and void. But I think you're both saying that, no, we didn't really mean that. Well, I agree that that's what the language says. I'm not contesting your reading of it. But your conclusion that that creates a situation where it can't be a final judgment is not correct. And the reason why it's not correct, Your Honor, is because you have to look at it on a jurisdictional analysis. And it's facts and offenses. Was there anything for the district court to do once he so ordered that judgment? And the answer is no. It doesn't matter if it falls apart based on what you all do. Because that doesn't change the finality of the judgment. He had never made a coverage decision, though, had he? Well, partial coverage decision that he was an insurer did not reach the questions of, well, was he insured for Hanford? Was he insured for the bankruptcy? I agree with you. He didn't reach that. But, again, he didn't have to because of SaskSales' conflict of circumstances having provided policy coverage to these other people. Were you saying the question, he hadn't resolved the question, but it had been resolved elsewhere and there was a judicial estoppel kind of thing going on? Usually we require something within the case itself that says, look, there are judicial estoppel principles at play here that prevent me from ruling in a particular way. And that did not happen. That would be the best practice. And we, I think, all can agree here that this case is a mess. It started in 2016 and has continued today because the parties were speaking against each other in various circumstances, like the settlement in front of Judge Moreira. But, unfortunately, we're making sausages here. And just because the sausage is not the sweet Italian that we love, it doesn't mean that it wasn't fine. The sausage is still sausage. So this is the only judgment that we have to base our 1291 jurisdiction on, right? It's that judgment merged with the two orders. And merged with the two orders, I do think that you have the factual basis that you need because what you're trying to do is answer the question, did the district court have anything to do after the judgment was entered? And I don't think it did not. There was nothing else for it to do. It's not. The stipulated part, was that something that would then be unwound by the actions of the Second Circuit? The whole purpose of an initial judgment like this is so that part of it can be unwound if the Second Circuit does something because that's what would provide the parties the ability to get the appellate decision that they need in order to go back and efficiently proceed. Last point. I know I'm trying to be patient. You don't want us to have a trial on part of this where we can't argue bad things. Right now, if we went back, if we just went back as the court, we didn't do this conditional judgment, we would have to go to trial. And Mr. Sassil's counsel would be right in barring us in a motion to eliminate from presenting our bad page arguments based upon the second damages judgment. So we have to go through an entire trial, then come back to you, then have you say, I agree, I'm going to reverse the damages decision, and we have to go back for a bad page trial. That makes no sense. And I know jurisdiction needs to be your threshold, but you do have it here. Thank you. Mr. Lugoski. I just want to say at the outset, I disagree that this case is a mess. I don't think this case is a mess. I think the district court conducted an orderly proceeding, although we entertained two motions for some judgment, and although we disagreed with one of them, I think both orders are reason to advance the case to the point where we can agree, even if we did it in precise, but not a judgment, to resolve remaining issues and bring this up on the table. So I do not agree from my perspective that this case is a mess. I want to just very briefly, some comments from my opposing counsel on what he calls the first refusal letter. If you look at page 1072 of the joint appendix, it's clear that when Scottsdale acknowledges coverage of Watershed and its officers, it's doing so because they are officers of Watershed, and Watershed was a third-party contender in that constant complaint. And these individuals, only Mr. Gaudio was a co-manager of Rod Piasma, who was also an officer of Watershed, but Mr. Citrone and Mr. Gambai had no affiliation at all with Rod Piasma. They were solely affiliated with Watershed. And as to counsel's point about when this policy was placed in November of 2015, which was, again, that intervening period between the Watershed option, I'm sure you know that, and the exercise of the Watershed option, there's no evidence in the record that Watershed agrees with Mr. McGrath's position that Watershed was seeking coverage for Rod Piasma when it came to this policy, and this is a renewal policy. And we point out in our opposition that Mr. McGrath first raised the argument that the Watershed option trade event resulted in Rod Piasma becoming a subsidiary in opposition to our motion for summary judgment in the district court, which was filed in 2012. Thank you very much. Thank you, Your Honor. Mr. McGrath. With regard to Judge Citrone, he was a manager of Rod Piasma once McGrath was jettisoned January 6, 2016. So I just want to correct that in the record. Mr. Gambai was deposed in the Canter proceedings because he was the controller of Watershed, but also the financial officer of Rod Piasma. So to the extent that the question is whether or not we have a situation, which it seems like Scott's backpedaling a little here, we have a situation where did Scottsdale provide insurance to Rod Piasma's officers and directors? The answer is yes. That's not even a dispositive question because once Rod Piasma became a subsidiary, March 2015, it really doesn't matter whether Scottsdale thought, which they didn't, because they didn't even know McGrath then, whether they were bargaining for McGrath or not. So I just wanted to clear that up. I also want to just address again, because I do think that if we actually get through the jurisdiction argument into the cover-up decisions and the damages, the court can look at Scottsdale's arguments and the first refusal and certainly the second refusal, which happens three years later, that you have a situation where an insurer made a mistake and Judge Lyman says, well, at best, it will only be a good faith mistake. What happened with Judge Lyman on the damages decision is that he basically usurped the role of the jurors. You needed to have, under New York law, you needed to have the questions of intent and questions of bad faith decided by the jury. And what Judge Lyman did, he tried to do a shortcut, and he said, well, there could be no reasonable inference based upon the circumstances surrounding the refusal. But that's not the case. If you look at the correct standard, which is the obvious standard in the by economy, what we find is that one of the matches of bad faith that I already discussed was an inaccurate refusal, which we have, and also a refusal that doesn't go into the analysis, which we have in the very, very first refusal. Then, let's fast forward three years. The policy was hidden. The policy had to be produced in an effort proceeding in front of Judge Marrero, and the broker's firm was shot down. Mr. McGrath, I'm going to give you 20 more seconds. Rule 26 required the policy be provided to McGrath, and it wasn't. The second refusal and the third refusal were both actually wrong. The third refusal was after the coverage decision when you had or determined that McGrath was an insurer and had refused coverage based upon no notice with regard to the Hanford proceedings, but the notice attached to the Hanford proceedings came back in 2016. And the district court actually, though, never made a coverage decision, right? For the district court to do. It had made a determination about whether he was an insured and on the bad faith claim, but wasn't it still an open question for the district court as to whether there was coverage? I just take one guess with the nuance. I think that if you read the damages decision, he was making that decision, and he didn't. He assumed it. Just wasn't labeled as such? Right, and that was part of why the damages decision is so wrong. Okay, thank you. Thank you very much. Court is adjourned.